UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cr-8-TRM-SKL |
| | ) | |
| STEPHEN RICHARD CROW, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT & RECOMMENDATION</u>

Before the Court is a motion to suppress filed by Defendant Stephen Richard Crow ("Defendant") [Doc. 18]. Defendant's motion seeks to suppress all evidence obtained as a result of a stop and search of his vehicle and person. Plaintiff United States of America ("Government") filed a response in opposition to the motion [Doc. 23]. Pursuant to 28 U.S.C. § 636(b), the motion to suppress was referred for a report and recommendation by standing order. An evidentiary hearing on the motion was held on June 13, 2023. The parties timely filed post-hearing briefs [Doc. 30 & Doc. 31], which have been carefully considered. This matter is now ripe. For the reasons addressed below, I **FIND** no constitutional violation occurred and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

## I.     FACTUAL BACKGROUND

The Government called the following witnesses: Special Agents Thomas Bagwell ("Bagwell") and Alicia Larkins ("Larkins") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and Chattanooga Police Department ("CPD") Officer Joshua George

("George").[1]  Defendant called no witnesses.  The collective evidence credibly establishes the following.

Law enforcement became aware of and investigated Defendant as a suspected drug trafficker in the Eastern District of Tennessee in the Fall of 2022.  Initially, law enforcement identified Hunter Coy ("Coy"), a convicted felon, as a suspected drug trafficker.  Bagwell, other ATF agents, and officers with the 10th Judicial Drug and Violent Crime Task Force ("DTF") arranged an undercover purchase of methamphetamine from Coy.

On October 11, 2022, Coy was stopped by the Cleveland Police Department.  After Coy denied consent to search the vehicle, a drug-detection dog alerted to the presence of the odor of narcotics emanating from the vehicle.  When officers conducted a probable cause search of the vehicle, they recovered a backpack containing a pistol and a resale amount of methamphetamine and other contraband.  Coy was searched and he possessed a large amount of cash, including funds utilized by the DTF during a controlled drug purchase conducted in September 2022.  Coy initially denied possession of the firearm and methamphetamine recovered from his backpack, claiming a passenger in the vehicle put the items there.  Eventually, however, Coy admitted to illegal possession of the firearm and methamphetamine and began to cooperate.  Coy admitted he had been distributing methamphetamine since July 2022 and he identified Defendant as his source of methamphetamine.  Coy described how Defendant traveled to Atlanta to get the illegal drugs.

---

[1] The witnesses have varying degrees of law enforcement training and experience.  As their respective law enforcement credentials, training, and experience are not directly challenged by Defendant, they will not be detailed herein.  Suffice it to say, the witnesses' testimony, including testimony about their perceived probable cause for the stop and search at issue, was not successfully challenged or undermined.  Some of the background facts and details are contained in the Search Warrant affidavit submitted as Government's Exhibit 1.  While there are video/audio recordings from police vehicle and body worn cameras, only Larkins' undercover wire recording was introduced as relevant.

Coy showed Bagwell drug-related text messages between himself and Defendant. Coy also allowed Bagwell to photograph Defendant's contact information on Coy's phone as well as text messages between the two.[2] Coy also said Defendant resided just across the state line in Georgia.

On October 13, 2022, Bagwell again interviewed Coy. During this interview, Coy claimed that he delivered methamphetamine to Randall Cooper ("Cooper"), another convicted felon, in Polk County, Tennessee, for Defendant. When asked how much methamphetamine he would deliver to Cooper, Coy indicated he delivered one kilogram and would receive eight ounces for doing so. Coy identified where Cooper lived and said Cooper had only been out of jail for a few months. Coy also again explained that Defendant traveled to Tennessee to deliver methamphetamine to Cooper after travelling to Atlanta, Georgia to pick up methamphetamine from Defendant's supplier. Coy stated Defendant resided on Crow Road in Georgia and that Defendant drove a silver Ford Focus. Coy again stated that the phone number he previously provided to Bagwell was the phone number he would use to communicate with Defendant. Coy admitted he had delivered methamphetamine to Cooper for Defendant on four occasions and said the largest of these methamphetamine deliveries was four kilograms. Coy identified Defendant and Cooper via photographs law enforcement provided. Coy also claimed Defendant had recently been arrested in Whitfield County, Georgia for a drug related offense.

The next day, October 14, 2022, Bagwell conducted database queries and determined that a known address for Defendant was on Peden Loop, which is adjacent to Crow Road NE. Database queries also indicated Crow had a silver Ford Fiesta registered in his name. Bagwell testified a silver Ford Focus and a silver Ford Fiesta look very much alike. Criminal history queries confirmed Defendant was arrested in Whitfield County, Georgia for drug related offenses

---

[2] Photographs of the text messages are Government's Exhibit No. 1A.

(1,000 grams of methamphetamine and $9,000 cash were seized) in August 2022. Officers also verified through open source research that the phone number on the text messages was associated with Defendant. Bagwell also confirmed Cooper was on felony probation in the State of Tennessee and was suspected of distributing methamphetamine by the DTF and Polk County Sheriff's Office.

In early November, after a parole search executed on Cooper's residence revealed evidence that he was engaged in drug distribution, Bagwell interviewed Cooper. Cooper provided information that confirmed, and was in addition to, the information provided by Coy. Cooper named additional people who were receiving large amounts of methamphetamine from Defendant. He told law enforcement that Defendant was traveling to Atlanta on the day of the interview, and he further told Bagwell that Defendant had previously done so. Cooper told Bagwell that Defendant also had a residence on Shallowford Road in Tennessee. Bagwell and others conducted surveillance at what was thought to be Defendant's apartment on Shallowford Road, and Defendant was observed at the apartment complex several times.

Bagwell, as the affiant, successfully obtained a federal search warrant from this Court, which is not at issue, for location information on the cell phone using the phone number identified by Coy as belonging to Defendant. Bagwell monitored the location data on this phone number from October 31 to November 12, 2022, when the cell phone stopped transmitting location information. During the time the phone was active and monitored, it made two trips to Atlanta, including one on a day that Cooper said Defendant had gone to Atlanta to get drugs. Bagwell admitted on cross examination that the location information could only show travel between Atlanta and Tennessee (on one trip with another stop), but that such location information does not show if Defendant stopped to obtain drugs.

4

On November 16, 2022, another law enforcement officer, Officer Sheller, stopped Defendant's vehicle at the request of ATF. They found him to be in possession of a small amount of marijuana and a large amount of cash, between $4,000 to $5,000. He was given a citation and released. Officers also stopped a couple of vehicles they saw leaving Defendant's apartment. It was around this time that Bagwell stopped receiving location monitoring information and Defendant changed vehicles to a silver Mitsubishi Outlander Sport. This new vehicle was observed in Defendant's parking area of his apartment complex. Cooper told the officers that Defendant said he changed his phone and started using an encrypted messaging application, Sudo, to communicate via a new number because his (Defendant's) phone had been acting "weird," and that he (Defendant) suspected he was being surveilled by law enforcement because two cars had been pulled over leaving his apartment. Bagwell concluded Defendant was "spooked."

On December 11, 2022, Cooper showed Bagwell various messages from Defendant to Cooper and Defendant's contact information on Sudo.[3] The messages indicated to the officers that Defendant was attempting to refresh his supply of methamphetamine and was upset with the quality and price his suppliers were charging him.

Larkins downloaded the Sudo application to communicate with Defendant in an undercover capacity. On December 14, 2022, Larkins contacted Defendant using the same number provided by Cooper to Bagwell. Using the Sudo contact information, Larkins successfully contacted Defendant to arrange what in Larkins' experience and training was a purchase of a large quantity of illegal drugs; that is, ten ounces of methamphetamine for $1,850. Regarding the below Sudo exchange, Larkins' training and experience is that "being good" meant

---

[3] Sudo messages with Cooper are Government's Exhibit No. 2. Larkins' communications with Defendant on Sudo are Government Exhibit No. 3.

"having the narcotics in his possession."   Portions of the Sudo exchange between Larkins and Defendant regarding the purchase include:

> Larkins: U still gonna do 225 a zip . . . that's more than I'm used to paying. . . . I just won't be able to wait around all day, my money will be good if you gonna have it when I need it . . . . I'll have a band to spend if people come through like they say

> Defendant: I usually have good stock on everything and I usually don't go as long as I have without being good. I went a little while without being good right now. I will be home late tonight but I'll be coming through your area tomorrow. I'll do 200 zip on them . . . What are you been paying?

> Larkins: 180-200 depending on who, but it's been hit n miss and no one is consistent enough with quality, time and price . . . If I can get the band will u have that?

> Defendant: Oh I gotcha . . . Do you wanna get 10? I'll do 1850.

Bagwell organized a takedown operation to coincide with Defendant's return from a trip to Atlanta and an anticipated undercover methamphetamine purchase from Defendant by Larkins on December 19, 2022.   Bagwell briefed various other law enforcement officers, including George, on the plans for the operation and for Larkins to consummate the large purchase of drugs discussed above.

Bagwell and other agents monitored Larkins's wire transmissions near the appointed meeting place on December 19.   Defendant instructed Larkins via Sudo communications to meet him at a specific restaurant, Fuji, located off the Shallowford Road exit in Hamilton County, Tennessee, and Larkins agreed.   Defendant arrived at the appointed time and place in his new Mitsubishi Outlander Sport to meet Larkins.   Law enforcement knew from the Sudo communications that Defendant was returning from Atlanta but did not know if he had stopped anywhere else prior to meeting Larkins.   Portions of the Sudo exchange between Larkins and Defendant regarding the purchase include:

6

Larkins: Damnnn if it's not to late tonight just hit me up if you can and I'll hold out but that puts me in a tough spot

Defendant: I'll be headed back no later than 7 o'clock

Larkins: What time you think u will be near me? . . . I just don't want to be waiting all night

Defendant: I'll be back in Chattanooga at 20 till nine

. . .

Defendant: I'm leaving Atlanta right now. I've been driving through for days now myself I just got back from a 4 Hour Dr. to Atlanta yesterday. and I've got other people meet me in Chattanooga nine

Larkins: Oh damn you've had a rough couple days. Where u want to meet . . . could u come to bass pro of the interstate? I'm not super familiar with chatt

Defendant: Meet me at Fuji of Shallowford Road exit . . . Bass pro is an E St. and you don't wanna meet nobody doing business in East Ridge

Just before the meeting was set to take place, the following Sudo exchange took place:

Defendant: Where are you

Larkins: 10 out

Defendant: What you drive

Larkins: Here . . . Silver truck . . . I just pulled in

Defendant: Pull over 5 places to your left

Larkins: Ok . . . Is that you?

Defendant: Yes

Larkins: I want to jump on here . . . You

Defendant: Come over here

During the meeting, Larkins wore a recording device in order to allow other agents to monitor the transaction. After she failed to get Defendant to come to her vehicle, Larkins

7

eventually approached Defendant's vehicle in the parking lot as instructed by Defendant. She recognized him and his vehicle based on her surveillance of his apartment on Shallowford Road. When she arrived at Defendant's vehicle, he attempted to get her to enter his vehicle. For safety reasons, she refused. After Larkins refused to enter Defendant's vehicle, Defendant started to drive away and Larkins then tried to say she would get in, but it was too late. Defendant drove away without an exchange of money or narcotics. Defendant also did not show money or narcotics to Larkins. Larkins testified she believed it was highly likely that Defendant had drugs in his car after he drove away from the location without completing the contemplated drug transaction.

After Defendant left, neither Bagwell nor Larkins followed to try to maintain the integrity of the undercover operation. Instead, Bagwell continued his surveillance from a distance and contacted the surveilling ATF and Chattanooga Police Department officers that he briefed earlier that day about the situation. Bagwell directed the Chattanooga Police Department officers to stop Defendant and to conduct a traffic stop if possible.

As noted above, earlier that day George attended the operation briefing with Bagwell and he also participated in the investigation as a plainclothes officer sitting in an unmarked car across the northern side of Shallowford Road. George did not remember whether he was notified the methamphetamine deal did not go through as planned, but he did remember he was notified Defendant was leaving the restaurant parking lot. George followed Defendant. George stayed in the right lane while Defendant's vehicle was driving in the left lane. George witnessed Defendant's vehicle cross the double lines on Shallowford Road at two separate times, then he radioed fellow-CPD Officer Gerrity ("Gerrity") and told Gerrity to conduct a traffic stop since George had observed the lane violation. Gerrity, who was in a patrol car with his drug detection

canine, pulled behind Defendant. CPD Officer Dyess ("Dyess") pulled behind Gerrity, and George pulled behind Dyess. The stop took place within two miles of the restaurant meeting location, in the middle turning lane near the entrance to Defendant's apartment. George observed Defendant's vehicle the entire way from the restaurant to the traffic stop, and Defendant did not stop anywhere in between.

George testified that even without the traffic violation, they would have stopped Defendant. He believes the on-going investigation had established sufficient probable cause for a stop regardless of a traffic violation. However, the CPD tried to develop a separate reason for the stop (and search) to protect Larkins' undercover identity. After the stop, Defendant was frisked by George. From the outside of Defendant's pants pocket, George felt a large amount of cash during the frisk, but he did not pull it out or otherwise search Defendant at that time. Later, following the search of Defendant's vehicle and the seizure of suspected methamphetamine, Defendant was searched, and a large sum of money was seized from his pocket.

After the frisk, George asked Defendant for consent to search the vehicle, and Defendant refused. To continue the charade that this was a routine traffic stop (to protect Larkins' undercover identity and the investigation), George then told Gerrity to deploy the drug-detection dog in Gerrity's patrol vehicle. The certified drug detection dog was deployed in an open-air sniff around the outside of Defendant's car, but the dog did not give a positive alert to the presence of the odor of narcotics. While the dog did not give a positive alert, Gerrity told George the dog showed "some interest" in the vehicle. George agreed on cross-examination that the dog sniff did not result in independent probable cause for a search of the vehicle.

Dyess observed a wrapper in Defendant's vehicle that he thought might be a commercial THC product (it was not and the Government does not rely on it for probable cause). George

9

communicated with ATF and ATF advised George to conduct a search of the vehicle. Based on the briefing, George believed they had probable cause to search Defendant's vehicle and planned to do so regardless of what happened after they pulled over his vehicle. Bagwell also believed there was probable cause to stop and search the vehicle based on the investigation and because Defendant had just aborted a large sale of methamphetamine. However, he also wanted to develop independent probable cause in order to protect Larkins' undercover identity, if possible.

Knowing the drug-detection dog did not alert on the vehicle, CPD officers searched the vehicle. During the search, a distribution quantity of methamphetamine, in the range of what Larkins had arranged to purchase, was found in Defendant's vehicle. After the methamphetamine was found, Defendant was detained and placed in the back of a patrol car in handcuffs. While Defendant was in the patrol car, Larkins got a Sudo message from Defendant. She then informed agents at the scene that she believed Defendant still had his encrypted cell phone because she received a message from him. The Sudo message Defendant sent Larkins while he was sitting in the backseat of the patrol car said, "You got me but not really." Officers then confirmed Defendant had his phone and retrieved it from him.

Defendant is charged with possession with the intent to distribute 50 grams or more of methamphetamine (actual) [Doc. 1].

## II.  STANDARDS

### A.  Fourth Amendment

All seizures—including brief investigatory stops—receive Fourth Amendment protection. *See United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). The Fourth Amendment guards against unreasonable

searches and seizures.[4]   U.S. Const. amend. IV; *Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.").

Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the seizure must be suppressed.   *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))).   This remedy of evidence exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure.   *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted).   It is the Government's burden, however, to demonstrate by a preponderance of the evidence that a particular search or seizure is constitutional.   *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citing *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

## III.   ANALYSIS

As refined during and after the hearing, Defendant challenges only the constitutionality of the warrantless search of his vehicle, conceding "officers had reasonable suspicion to stop [Defendant] based upon the aborted drug deal but not probable cause to search." [Doc. 30 at Page

---

[4]  A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right.   *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).   As a preliminary matter, the government does not contest that Defendant had a legitimate expectation of privacy with respect to all issues raised in his motion.

11

ID # 493].    The Government argues the officers had ample probable cause for both the stop and vehicle search based on their months-long investigation of Defendant.    After careful consideration of the evidence and argument, I **FIND** the stop and vehicle search were supported by probable cause and thus constitutional.

### A.  The Search

Recognizing it must establish probable cause for the search of the vehicle, the Government argues the collective knowledge of the officers established probable cause to both stop and execute a search of Defendant's vehicle.    Probable cause exists in this case if, under a totality-of-the-circumstances analysis, there was a fair probability that contraband or evidence of a crime would be found in Defendant's vehicle at the time the search was executed.    *See Illinois v. Gates*, 462 U.S. 213, 233, 238 (1983); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (holding probable cause requires only "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." (internal quotation marks and citation omitted)).

Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."    *Gates*, 462 U.S. at 232.    Probable cause is established if the facts available to the officer at the time of the search would warrant a person of reasonable caution in the belief that the area or items to be searched contain contraband or evidence of a crime.    *United States v. Ross*, 456 U.S. 798, 808 & 808 n.10 (1982).    Probable cause is assessed based on the totality of the facts, including any facts that may dissipate probable cause.    *See Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (holding "the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest"), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Under the Fourth Amendment, a warrantless search such as the one at issue is presumed to be unreasonable unless it falls within one of a few narrowly drawn exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). One such exception, the "automobile exception," allows officers to search an automobile if they have probable cause to believe that it contains contraband or evidence of a crime. *Ross*, 456 U.S. at 806-08; *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *Hernandez v. Boles*, 949 F.3d 251, 259 (6th Cir. 2020) (holding that law enforcement officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime). "An automobile search is not 'unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.'" *United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) (quoting *Ross*, 456 U.S. at 809). "If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may, without a warrant, search "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *Ross*, 456 U.S. at 820-21). The scope of a warrantless search based on probable cause is "no narrower–and no broader–than the scope of a search authorized by a warrant supported by probable cause." *Ross*, 456 U.S. at 823. *See also California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

Under the "collective knowledge doctrine" a court "impute[s] collective knowledge among multiple law enforcement agencies," and the doctrine permits "a responding officer [to execute] a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). It is also permissible for one officer to rely on another officer's observations for purposes of establishing probable cause.

13

*See United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) (holding that for assessing whether probable cause exists, the court "mutually impute[s] the knowledge of all the agents working together on the scene and in communication with each other"); *see also United States v. Rodriguez-Suazo*, 346 F.3d 637, 650 (6th Cir. 2003); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." (citing cases)); *United States v. Sheckles*, 996 F.3d 330, 344 (6th Cir. 2021) ("The lawfulness of a stop does not turn on the subjective 'motivation' of the officer making it; it turns on the objective facts justifying the stop." (citation omitted)).

Moreover, "a pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox*, 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citation and quotation marks omitted).

Although not articulated precisely this way by the parties, it appears the pertinent, post-hearing remaining issues are: (1) whether law enforcement had probable cause to believe evidence of drug trafficking would be present in Defendant's vehicle at the time of the stop; and (2) if so, whether probable cause was extinguished by the dog's failure to alert prior to the time the search was conducted. I will address these issues in turn.

### B. Was There Probable Cause at the Time of the Stop

As noted, Defendant concedes the stop was supported by reasonable suspicion but argues the officers lacked probable cause for the search. To support his argument, Defendant contends

14

Coy and Cooper were not reliable and their information that Defendant was a major supplier of drugs or that he travelled to Atlanta to purchase drugs was never corroborated by law enforcement. This argument fails.

Applying the collective knowledge doctrine, the I **FIND** the officers who stopped Defendant's car knew: (1) law enforcement officers were engaged in an ongoing investigation into drug trafficking by Defendant; (2) Coy and Cooper, against their penal interests, separately and consistently admitted details of drug trafficking and identified Defendant as their source of illegal drugs; (3) law enforcement confirmed certain details given by Coy and Cooper, including the places Defendant lived, the general type and color of car Defendant drove and when he changed cars, Defendant's change in phone numbers and the use of Sudo to communicate about drug deals, Defendant's travel to Atlanta, and that Defendant had recently been arrested on drug charges; (4) Defendant's arrest record; (5) Cooper introduced Larkins to a person Cooper identified as Defendant using a specific Sudo phone number for the purpose of arranging a drug deal; (6) Larkins arranged the drug buy using that Sudo phone number, which was scheduled to take place upon Defendant's return trip from Atlanta; and (7) Defendant showed up at the set time and place upon his return from Atlanta, but the prearranged drug deal was aborted, with no exchange of money or showing of narcotics at the scene, when Larkins declined to get into Defendant's vehicle.

As to Coy and Cooper's information, "[p]robable cause may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *United States v. Stokes*, 742 F. App'x 947, 950 (6th Cir. 2018) (quoting *Lumpkin*, 159 F.3d at 986). "Informants' tips . . . come in many shapes and sizes from many different types of persons." *Id*. (citing *Gates*, 462 U.S. at 232). Courts must consider "veracity," "reliability," and "basis of knowledge" in assessing the value of an informant's

Case 1:23-cr-00008-TRM-SKL   Document 32   Filed 07/13/23   Page 15 of 24   PageID #: 521

information. *Gates*, 462 U.S. at 230. "[A] deficiency in one [relevant consideration] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Stokes*, 742 F. App'x at 950 (quoting *Gates*, 462 U.S. at 233). It is a "'sliding scale' that runs between less reliable tips (such as those come from anonymous sources) and more reliable tips (such as those that come 'from known or reliable informants')." *Id.* (quoting *United States v. Williams*, 483 F. App'x 21, 25 (6th Cir. 2012)). As for corroboration, the Supreme Court has instructed that these considerations are not "entirely separate and independent requirements to be rigidly exacted in every case." *Id.* at 230. That is to say, "police need not always independently corroborate a [confidential informant]'s information." *United States v. Smith*, 510 F.3d 641, 652-53 (6th Cir. 2007) (citing *United States v. Allen*, 211 F.3d 970, 972, 974 (6th Cir. 2000) (en banc)).

Here, both Coy and Cooper were known informants who admitted they had personally engaged in illegal activity; that is, they distributed methamphetamine supplied by Defendant, which increases the reliability of their information. *See, e.g., United States v. Harris*, 403 U.S. 573, 583 (1971) ("People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."); *United States v. Riddick*, 134 F. App'x 813, 821 (6th Cir. 2005) (collecting similar cases finding probable cause based on known informants implicating themselves in criminal activity); *see also United States v. Hodge*, 714 F.3d 380, 384-85 (6th Cir. 2013) ("Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability."); *United States v. Moore*, 473 F. App'x 495,

497 (6th Cir. 2012) ("probable cause exists where the informant is named and relates seeing the defendant committing a crime inside [his] residence"). Although substantial police corroboration is not necessary when other hallmarks of reliability exist to a sufficient degree, as here, in this case the officers did corroborate much of the information Coy and Cooper supplied, as addressed above. Finally, the two informants gave consistent information, which is yet another indication of reliability supporting probable cause. *See United States v. Lancaster*, 145 F. App'x 508, 511 (6th Cir. 2005).

As required by *Gates*, I have applied a totality-of-the-circumstances analysis and have balanced the strengths and weaknesses in assessing the value of Coy and Cooper's information. *See* 462 U.S. at 233. It is not a close call. I find the details that Cooper and Coy provided against their own penal interests and the officers' corroboration of several of those details, in combination with the communications between Larkins and Defendant, constitutes abundant probable cause for the stop and a search at the time the stop was initiated. This is so even though the officers had new information that the drug deal arranged by Larkins was aborted prior to the stop. That the deal was aborted when Larkins declined Defendant's invitation to get in his vehicle or that Defendant may have been conducting countersurveillance does not materially diminish, and may even strengthen, the officers' probable cause to believe that Defendant's vehicle, which he drove to a prearranged drug deal upon a return from Atlanta where he typically travelled to obtain his supply of drugs according to Coy and Cooper, contained contraband or evidence of a crime. *See Ross*, 456 U.S. at 806-08

**C. Did the Probable Cause Completely Dissipate Prior to Execution of the Search?**

The remaining question is whether the dog's failure to alert deprived the officers of the already-existing probable before the search was executed. *See United States v. Bowling*, 900 F.2d

926, 932 (6th Cir. 1990) (holding that the "law is clear" there must be probable cause at the time the judge issues the warrant and at the time officers execute it).   Defendant seems to argue that because the drug-detection dog was certified, his failure to alert destroyed any existing probable cause.[5]   Acknowledging the dog's failure to alert is a fact that must be considered by the Court, the Government does not dispute the certification or reliability of the dog, but instead argues the officers had sufficient probable cause for a search despite the dog's failure to alert.   I agree the drug-detection dog's failure to alert is a factor that must be considered in assessing probable cause under the totality of the circumstances, and in this case **I FIND** it did not destroy the already-existing probable cause.   *See United States v. Davis*, 430 F.3d 345, 356, 367 (6th Cir. 2005) (Sutton, J. concurring in part and dissenting in part) (citing cases acknowledging "a near universal recognition that a drug-sniffing dog's failure to alert does not necessarily destroy probable cause").

Relying on *Davis*, Defendant argues any probable cause was dispelled during the initial investigatory detention when the drug-detection dog failed to make a positive alert on the vehicle. In *Davis*, the Sixth Circuit held police officers violated the Fourth Amendment when they prolonged a traffic stop for an additional hour to call a second drug-detection dog to the scene, after the first dog failed to alert on Davis's vehicle.   430 F.3d at 356.   There is a crucial difference between *Davis* and the case at bar, however.   That is, *Davis* addressed a seizure based on reasonable suspicion (i.e., a Terry stop), not probable cause, a point emphasized in the majority opinion.   *Id.* (noting that in cases where drug-detection dogs fail to alert but searches are nevertheless upheld, "the courts determined that even without the dog's alert there was probable cause to justify a more extended detention, whereas in this case there was only the more limited

---

[5]   I acknowledge Defendant argues only reasonable suspicion ever existed.

18

basis of reasonable suspicion."); *see also id.* at 351 ("Because we believe that the police lacked reasonable suspicion to detain Davis once the first drug-sniffing dog failed to alert, we agree that the search of Davis's vehicle violated the Fourth Amendment.").[6]

The constitutionality of a Terry stop depends, in part, on the stop being "sufficiently limited in time." *Id.* at 354. The Sixth Circuit found that while the stop itself and the short initial delay (while the first dog was en route) were justified, the officers impermissibly extended the duration of the stop when they continued to detain Davis after the purpose of the traffic stop had been fulfilled/completed[7] and the first dog failed to alert on Davis's vehicle. *Id.* at 356-57. The court found once the first dog failed to alert, the "police already had confirmation" there were no drugs in Davis's vehicle, such that the additional delay for the arrival of the second dog "simply delayed the release of Davis and his vehicle without any investigatory purpose." *Id.* at 356.

The probable cause/reasonable suspicion distinction is also addressed in the dissenting opinion. *Id.* at 363-64 (Sutton, J., concurring in part and dissenting in relevant part) ("My problem is that when the officers initially detained Davis, they had probable cause, not reasonable suspicion, that Davis was involved in drug trafficking."). And, as the dissenting opinion points out, there is a "near universal recognition that a drug-sniffing dog's failure to alert does not necessarily destroy probable cause[.]" *Id.* at 367 (collecting cases).

---

[6] The court found the officer who pulled Davis over had "probable cause" to believe Davis was speeding. *Id.* at 352. The court was careful to note, however, that "[p]robable cause to believe that a traffic violation has occurred is unlike probable cause to believe that a criminal violation has occurred and thus does not allow the police to detain a suspect indefinitely." *Id.* at 353. The court observed the long-standing rule that an "ordinary traffic stop . . . is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, [392 U.S. 1 (1968)], apply to define the scope of reasonable police conduct." *Id.* (quoting *United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002)).

[7] Davis was issued a warning for speeding. *Davis*, 430 F.3d at 349.

19

This is not to say that *Davis* drew a bright line rule regarding drug-detection dogs when there is only reasonable suspicion versus probable cause. Indeed, in *United States v. Colbert*, 525 F. App'x 364 (6th Cir. 2013), the Court discussed *Davis* in an illuminating passage worth quoting in its entirety:

> Colbert challenges the scope and duration of his detention after the initial traffic stop for failure to use a turn signal had concluded. We have repeatedly held that to detain a suspect after an initial traffic stop has concluded, the officer must have reasonable suspicion of additional criminal activity. When a stop is prolonged, we ask whether the "totality of the circumstances surrounding the stop indicates that the duration of the stop as a whole . . . was reasonable."
>
> Colbert argues that the police lacked reasonable suspicion to expand the scope and duration of the traffic stop to investigate him for drug possession. Further, Colbert argues that even if the police had reasonable suspicion of drug possession, such reasonable suspicion was dispelled when the dog failed to alert positively to the presence of drugs in the vehicle. The government responds that the police had reasonable suspicion of drug possession from observing the transactions in which Colbert participated, and the failure of the dog to alert did not negate this reasonable suspicion.
>
> The facts of this case bear some similarity to those in *Davis*. In *Davis*, officers suspected that Davis was involved in drug activity based on three observations: (1) a cocaine supplier met, at different times, with three different people, and officers found cocaine on each of these three people immediately after the three meetings; (2) the cocaine supplier talked face-to-face with Davis; and (3) there were detergent boxes close to Davis's car. *Davis*, 430 F.3d at 349. An officer pulled Davis over for speeding, and officers brought a drug-detection dog to the scene. We found that the officers had the reasonable suspicion necessary to prolong the stop to locate and procure the dog. After the dog failed to alert, the officers on the scene detained Davis for an additional hour, until a second dog was brought to the scene. We held that the officers' suspicions in *Davis* were dispelled when the first dog failed to alert and that the officers' prolonged detention of Davis after the first dog failed to alert violated the Fourth Amendment.
>
> **Like in *Davis*, we conclude that the officers here had reasonable suspicion that Colbert possessed drugs to support**

20

detaining him after the initial traffic stop had concluded. In *Davis*, the officers suspected Davis primarily because of the actions of a person with whom he associated, a known cocaine supplier. They inferred that because Davis was meeting with the cocaine supplier, Davis must also have been engaged in drug activity. Here, on the other hand, Nichols suspected Colbert because of Colbert's own actions. Nichols inferred that because Colbert appeared to be engaging repeatedly in the hand-to-hand transactions characteristic of drug trafficking in a park known for its drug activity, there was a reasonable likelihood that Colbert had been engaging in drug trafficking. The failure of the drug-detection dog to alert initially to drugs in Colbert's vehicle did not dispel that suspicion.

Additionally, unlike in *Davis,* there was virtually no delay between the dog's failure to alert, Nichols's questions, and Colbert's immediate admission to the presence of drugs in the vehicle. Under these circumstances, "the duration of the stop as a whole . . . was reasonable."

*Colbert*, 525 F. App'x at 367-68 (emphasis added) (internal citations omitted).[8] Ultimately, the court affirmed the district court's denial of Colbert's motion to suppress/request for a *Franks* hearing. *Id.* at 366.

Thus, although in *Colbert* the court did not address the probable cause standard, the foregoing discussion makes clear that *Davis* is readily distinguishable from the facts of the case at

---

[8] Because the devil is always in the details, I offer the following elaboration on the facts of *Colbert*. Officers observed Colbert engaging in behavior consistent with selling drugs in a park known for the prevalence of drug trafficking. In the span of 30 minutes, he approached ten to fifteen individuals and vehicles, "and then quickly returned each time to his vehicle or picnic table after a short interaction." 525 F. App'x at 364. Colbert then left the park, drove to a house a few blocks away, went inside, left after a few minutes, and returned to the park. He then began engaging in the same behavior as before—approaching numerous individuals and engaging in short transactions consistent with drug dealing. Colbert then went to the same house a second time and began the routine for a third time. Officers observed all these actions by Colbert. On his third trip back to the park after leaving the house, officers pulled Colbert over for failing to use his turn signal. Colbert refused to consent to a search. Officer Nichols questioned Colbert for an additional 10-15 minutes until a drug-detection dog arrived. The dog did not alert on Colbert's car; however, no one informed Colbert of that fact. Instead, Nichols immediately asked Colbert if Colbert was sure there was nothing in his vehicle. Colbert then admitted there was marijuana in the car. A subsequent search of the car revealed marijuana and a gun. *Id.* at 364-66.

bar.   As a recent, non-binding decision stated regarding *Davis*: "[T]he court in *Davis* repeatedly emphasized that, at the time of the negative sniff, the police officers did not have probable cause to believe that the vehicle contained illegal contraband."   *United States v. Beal*, 536 F. Supp. 3d 743, 752 (D. Haw. 2021) (citations omitted) (holding that because officers had "probable cause to believe that [a] stopped truck contained illegal drugs before the dog sniff of the vehicle, the negative dog sniffs that subsequently occurred did not destroy the probable cause that already had attached" (cleaned up)).   Indeed, the facts here are more supportive of a finding of probable cause than the facts in *Colbert*, where the court found no Fourth Amendment violation.

By analogy, in *United States v. Green*, 554 F. App'x 491, 496 (6th Cir. 2014), the Sixth Circuit addressed the issue of whether probable cause completely dissipated following the issuance of a warrant when, prior to its execution, police learned the suspect would not have cocaine at his residence on the day the search was to be executed.   The Sixth Circuit upheld the district court's conclusion that probable cause had not completely dissipated at the time the search was executed because the house was being used in ongoing drug trafficking, police received additional information that marijuana would be coming into the house, and the warrant covered more than just drugs.   *Id.* at 496.   The Sixth Circuit held: "The mere fact that Green did not intend to have a particular drug on him on a particular day did not mean that his residence would no longer contain evidence of cocaine or cocaine manufacturing."   *Id.*

Finally, in *United States v. Wickersham*, 344 F. App'x 155, 156 (6th Cir. 2009), the police received an anonymous tip that Wickersham was transporting drugs, so a state trooper followed Wickersham's vehicle and initiated a traffic stop after witnessing the vehicle cross the center line of the road twice.   *Id*.   After an initial positive alert by the dog, a search was conducted but no drugs were found.   When the dog was redeployed after the failed search, it did not alert.   The

Sixth Circuit held probable cause did not dissipate after the initial search failed to find drugs or even after the dog failed to alert on a second deployment. *Id*. at 159. The court found probable cause continued to exist throughout the encounter given the first alert, the informant's tip, an officer's observation of a reconfigured component in the car, and an occupant's suspicious answers to questions. *Id.* *See also United States v. Perez*, 440 F.3d 363, 374-75 (6th Cir. 2006) (holding the failure of a drug-detection dog to alert to a vehicle did not negate probable cause derived from an alert of a different dog an hour later); *Carter v. Hamaoui*, 699 F. App'x 519, 533 (6th Cir. 2017) ("Nor does the delay in the alert or the failure of a subsequent dog to alert dissipate the probable cause."); *United States v. Pigg*, No. 1:17-CR-00005, 2019 WL 542305, at *6 (M.D. Tenn. Feb. 11, 2019) ("Therefore, the canine's failure to alert did not deprive the officers of the already-existing probable cause to search the Jeep for evidence of drug-related crimes.").[9]

As noted, I find the drug-detection dog's failure to alert in this case is a relevant factor to consider under the totality of the circumstances, but it is not dispositive on the issue of probable cause. The officers lawfully could consider pre-existing information in making the objective determination of whether there was a fair probability that evidence of a crime would be found in Defendant's vehicle despite the drug dog's failure to alert. I find the evidence of criminal activity here was strong enough to establish a fair probability that evidence of a crime would be found in Defendant's vehicle. Defendant's argument regarding George's admission that *independent* probable cause, which might protect the informant's identity, was not developed for a search when

---

[9] While *Green* and *Wickersham* are unpublished and therefore non-binding, and *Green* involves execution of a warrant, these cases remain persuasive authority concerning the fact intensive issue of the survival of probable cause despite changes in circumstance. Although these and some of the other cases cited herein were not addressed by either party, they are pertinent to the issue of dissipation of probable cause.

the dog failed to alert adds little to the analysis. Had the dog alerted, then all the other factors would not need consideration under applicable precedent, but the reverse is not true. That the dog did not alert does not destroy the probable cause that did exist. As ended up being the case here, the dog might have been mistaken or unable to perceive drugs or other drug-related evidence within the vehicle. While it may be a somewhat closer call after the dog failed to alert, I **FIND** the Government has met its burden to prove probable cause for the vehicle search under a totality-of-the-circumstances analysis because there was a fair probability that contraband or evidence of a crime would be found in Defendant's vehicle when the search was executed. *See Gates*, 462 U.S. at 233, 238.

Accordingly, Defendant's motion to suppress based on the stop and search should be denied.

## IV. CONCLUSION

For the reasons stated above, I **RECOMMEND**[10] that Defendant's motion to suppress [Doc. 18] be **DENIED** in its entirety.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).