UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at Chattanooga

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                              NO. 1:23-CR-008 TRM SKL

STEPHEN RICHARD CROW,

    Defendant.

## OBJECTION TO REPORT AND RECOMMENDATION

Defendant, Stephen Richard Crow, by and through undersigned counsel, and for Objection to report and Recommendation would state the following:

## FACTS

Defendant relies on all of the facts set out in this section. Alcohol Tobacco and Firearms (ATF) Agent Jeff Bagwell testified for the government. The evidence showed that the agents of ATF became aware of the Defendant, Stephen Crow in September 2022. Hunter Coy was being investigated in the Cleveland, Tennessee area for drug trafficking. After Coy's arrest, he identified Stephen Crow as his source of supply. Tr. Pg. 10 ln 25. During debriefing he showed law enforcement his phone and text messages that were indicative to law enforcement of drug distribution. Tr. Pg. 11 ln 3. Coy said crow was a resident in Whitfield County, Georgia and drove a Silver Ford Focus. Tr. Pg. 11 ln 9. Further, he claimed Crow was recently arrested of possessing a large amount of methamphetamine. Tr. Pg. 11 ln 12.

ATF agents ran an NCIC search on Stephen Crow and found that he had been arrested in Whitfield County, Georgia for multiple narcotics related offenses. Tr. Pg. 11 ln 23. Agents also found a silver Ford Fiesta registered to Stephen Crow. Tr. Pg. 12 ln 10. The agents knew that the model was incorrect but the color and make matched. Coy claimed that Crow went to Atlanta to get methamphetamine. Tr. Pg. 13 ln 1. The text messages were photographed and preserved as

evidence and offered as exhibit "1A". Tr. Pg. 14 ln 11. The green messages in the texts were from Coy and the white messages were from Crow. Tr. Pg. 15 ln 6. ATF agent Bagwell testified that he believed the text were about Crow being in Atlanta and gathering money to purchase methamphetamine. Tr. Pg. 19 ln 1. A phone number for Crow was given by Coy. Coy talked about other drug dealers. He mentioned that he had distributed for Crow methamphetamine to Randall Cooper. Particularly he recalled four occasions with the max amount being 4 kilos. Tr. Pg. 20 ln 21. Agents attempted to corroborate what Cooper had related. Tr. Pg. 21 ln 5-25 and Pg. 22 ln. 1.

Agent Bagwell included the information about the Defendant's phone in an affidavit for a search warrant seeking GPS location. Tr. Pg. 22 ln 13-22. The search warrant was granted, and location monitoring occurred for 11-12 days on the phone number given by Hunter Coy. Tr. Pg. 23 ln 13. Two trips to Atlanta were confirmed by GPS location monitoring to Atlanta. Tr. Pg. 23 ln 23.

Randall Cooper was subject to a parole search. Cooper advised Bagwell that he had introduced Coy and Dawson Becker to Crow. Tr. Pg. 25 ln 18. Cooper mistakenly said that Crow owned a Ford Focus. Tr. Pg. 25 ln 24. Cooper said that Crow lived in Chattanooga off Shallowford Road. Tr. Pg. 26 ln 1. Agents were told by Cooper that Crow sold him large amount of methamphetamine along with Coy and Becker. Tr. Pg. 26 ln 6. On early November Cooper told me Crow was traveling to Atlanta. Bagwell testified that he was receiving GPS monitoring location of the phone he had a search warrant issued on showing a trip to Atlanta. Tr. Pg. 27 ln 6.

Agent Bagwell spoke with Det. Caraway in Whitfield County, Georgia about the arrest in the county. Caraway said the arrested Crow on Peden Loop which is adjacent to Crow lane. Tr. Pg. 28 ln 22. Crow was arrested with cash and methamphetamine. Tr. Pg. 29 ln 1. Evidence

corroborated that Crow was living in Chattanooga and drove a silver Ford Fiesta. Tr. Pg. 30 ln 23.

On the 16th, of November 2022, Chattanooga Police pulled Crow over at the insistence of ATF. Tr. Pg. 31 ln 4. Narcotics canine was deployed and found marijuana and some U.S. currency. Tr. Pg. 31 ln 11. He was cited and was driving the silver Ford Fiesta at the time. Tr. Pg. 32 ln 9. Crow was surveilled at apartment #25 by task force officer in Chattanooga. Tr. Pg. 33 ln 1. Cooper advised Bagwell that Crow had become suspicious from officers pulling individuals over leaving his apartment and from his cell phone behaving in an unusual manner. Tr. Pg. 33 ln 21.

Crow changed vehicles from the Ford to a grey Mitsubishi, and Cooper told me about the change. Tr. Pg. 34 ln 10. Surveillance confirmed the vehicle described was parked where the Ford usually parked at the complex. Tr. Pg. 34 ln 10. Never saw Crow in the Mitsubishi. Tr. Pg. 34 ln 24.

Cooper advised Bagwell that Crow was using an encrypted app for distributing called SUDO. Tr. Pg. 35 ln 24. Messages were shown by Cooper to Bagwell from the SUDO app in December 2022 which the government introduced as Exhibit "2". Tr. Pg. 36 ln 5. The messages are from Cooper to Crow. Tr. Pg. 37 ln 20. According to Cooper, Crow is using 762-499-5551 on the SUDO app as a phone number. Tr. Pg. 38 ln 25 and Pg. 39 ln. 1. Agent Bagwell asked ATF agent Larkins to make an undercover buy from Crow. Tr. Pg. 39 ln 9. Cooper introduced Larkins in an undercover role to Crow. Tr. Pg. 40 ln 20. Bagwell testified that he believed trough texting on SUDO that Crow was in Atlanta buying drugs. Tr. Pg. 41 ln 18. A meeting was arranged between Larkins and Crow. Tr. Pg. 45 ln 3. Crow and Larkins arranged to meet to conduct a drug buy on SUDO. Tr. Pg. 42 ln 6. The transaction was to take place at Fuji restaurant off of Shallowford Rd., but it was aborted by Crow. Tr. Pg. 46 ln 9. No money or drugs were transacted at Fuji and no negotiations occurred there. Tr. Pg. 71 ln 2. There were

discussions about amounts of drugs and cost on the SUDO app only. Tr. Pg. 46 ln 9. In the discussions on SUDO discussions were held using code words. Officers believed that methamphetamine was being discussed. Tr. Pg. 110 ln 22.

Officer Larkins assumed that her contact with the person using the SUDO app was pre-arranged. Tr. Pg. 85 ln 18-21. On pages Tr. Pg. 86 ln. 13- pg. 87. Ln 14 the critical terms of the transaction were discussed.

Q       "I'm gonna be up here tomorrow. Don't worry about what I'm gonna have. Just let me know what you gonna need.

A       "You still gonna do 225 a zip? That's more than I'm used to paying. I just won't be able to wait around all day. My money will be good if you gonna have it when I need it. I'll have a band to spend if people come through like they say.

Q       "I usually have a good stock on everything and I usually don't go as long as I have without being good. I went a little while without being good right now, but I'll be home late tonight, but I'll be coming through your area tomorrow.

I'll do 200 zip on them. What are you been paying?

A       "180 to 200 depending on who, but it's been hit --

hit and miss and no one is consistent enough with quality, time, and price. If I can get that band, will you have that? Q       "Oh, I gotcha. Do you want to get ten? I'll do 1850.

A       "Tbh I don't know if I'll be able to get that cash up front. I can try, but I'm not even back in town yet. What time you think you'll come through so I can make sure I'm good on my end?

Q       "Idk. You're in -- you're in Athens.

A       "Yeah, but I work in Cleveland and Athens sometimes depending on the day.

Q       "I have to be in Athens tomorrow.

A   "Okay. Just hmu and I'll make sure I'm good.

Agent Larkins negotiated a transaction for zips, and she testified that zips are *ounces* and in this case she *assumed it was methamphetamine.* Tr. Pg. 90 ln. 5-13. See also Pg. 111ln. 13-20. There was no money or drugs seen exchanged at Fuji. Tr. Pg. 112 ln.7. There were no controlled buys from Crow before the meeting at Fuji. Tr. Pg. 113 ln. 24. Larkins did not know if Crow was using the SUDO app to arrange the supposed transaction. Tr. Pg. 117 ln. 3. She only knew that he showed up at the Fuji parking lot. Tr. Pg. 117 ln. 20-25.

Crow left the Fuji restaurant parking lot. Tr. Pg. 107 ln. 10. Crow traveled on Shallowford Rd. westbound and under surveillance. Tr. Pg. 47 ln 6. Officer tried to develop independent probable cause but that did not happen. Tr. Pg. 48 ln 10; and Pg. 123 ln. 24. He was pulled over around the 6300 block of Shallowford Rd. Tr. Pg. 123 ln 14; and Pg. `139 ln. 7. Officer Gerrity initiated a stop by activating the emergency lights on his vehicle. Defendant was pulled over for failure to maintain lane. Tr. Pg. 137 ln 8. Allegedly, the defendant crossed the "dotted" line two separate times. Tr. Pg. 137 ln 8. Chattanooga Police canine officer deployed his dog and performed an open are sniff search. Tr. Pg. 148 ln 16. The certified dog did not alert. Tr. Pg. 148 ln 23. Officers decided to search the defendant's car. During the search a large quantity of methamphetamine was found. Tr. Pg. 71 ln 17. Crow was never seen with drugs or making any transactions for drugs before the search. Tr. Pg. 72 ln 1-Pg. 73 ln. 1.

## LAW

### Defendant Objects to the Court finding that Probable Cause Existed before the Stop and Search

a. **Facts about the Informants**

The Court found erroneous facts in the Report and Recommendation Doc.# 32. The Court relies on the *United States vs Harris*, 403 U.S. 573, 583 (1971) which includes in its analysis an

assessment of informant declarations. While it is true that the court attributes credibility to the informant admissions of criminal activity as having "some indicia of credibility." Id at 583. The discuss in *Harris* involves admissions of crimes of the informant. Id at 583. The *Harris* court admits that if viewed through the context of admissibility that the court would not allow the introduction of these statements into evidence because of their untrustworthiness. Ida at 583-584. Criminals in the federal system, and those who are being interviewed by federal drug enforcement agents have reason to provide information to help themselves which rests on a number of motivations. Self help is the primary motivation among drug dealers like Coy and Cooper.

    b. **Law on Informant Reliability**

In the context of assessing tips from informants for affidavits, an affidavit including a tip from an informant that has been proven to be reliable may support a finding of probable cause in the absence of any corroboration. *United States v. Smith*, 182 F.3d 473, 478-79 (6th Cir.1999). Alternatively , when an affidavit supplies little information concerning an informant's reliability a finding of probable cause, under the totality of the circumstances may be supported if it includes sufficient corroborating information. *Illinois v. Gates*, 462 U.S. 213, 241-45, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)

A "tip from a known informant whose reputation can be assessed and who can be held responsible if his allegations turn out to be fabricated" is far more trustworthy than an otherwise un-named informant. *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). When an informant observes a crime "first-hand," that "entitles [the] tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234, 103 S.Ct. 2317. These considerations are not independent requirements; instead, we consider them under the totality of the circumstances. *Gates*, 462 U.S. at 230, 103 S.Ct. 2317.

The information supplied by Coy and Cooper was untested and uncorroborated. No drug transaction was known about by these law enforcement with Crow before his arrest. Tr. Pg. 113 ln. 24. Crow was never seen with drugs or making any transactions for drugs before the search. Tr. Pg. 72 ln 1-Pg. 73 ln. 1. The phone number used on SUDO and provided by Cooper required reliance on Cooper that it was associated with the Defendant. Tr. Pg. 116 ln. 18-25.

    c. **The Failed Transaction**

The Court assumes the transaction was and aborted drug transaction. (Doc#32 Pg. Id #521) Agent Larkins did not know who she was talking to on the SUDO app. Tr. Pg. 117 ln. 3 The court wrongly assumes that because the Defendant Crow showed up at the Fuji restaurant parking lot that he was using the app and the transaction conversations was with Crow. Doc. 32 Pg. Id.# 521. However, Agent Larkins testified that she did not know who arranged Crow to show up at Fuji parking lot, or who was using the SUDO app. Tr. Pg. 116 ln. 21-25. The court relies on Cooper saying the SUDO app was used by Crow to associate the defendant with the SUDO app. Doc. 32 Pg. Id.#521. However, the court was wrong because there was no evidence to corroborate that the Defendant was using the SUDO app except Coopers word. It remained uncorroborated prior to the arrest of the defendant. Agent Larkins assumed that the discussion on SUDO was about methamphetamine. Tr. Pg. 90 ln. 5-13. See also Pg. 111 ln. 13-20 However, the discussion on SUDO between the person on the phone and Agent Larkins only discusses zips. Larkins says zips are ounces but does not discuss ounces of what substance. Tr. Pg. 90 ln. 5-13. See also Pg. 111 ln. 13-20. The only identification that methamphetamine was being delivered by Crow was the idea that meth costs a certain range $180.00-$225.00 per ounce and it was this association between meth and money that Agent Larkins introduces into the transaction. Tr. Pg. 86 ln. 13- pg. 87. Ln 14. There are no slang words used to describe what is being negotiated for delivery. The person using the SUDO app never identifies what substance is being negotiated in the transaction and in facts says I have everything. Tr. Pg. 86 ln. 13- pg. 87. Ln 14.

For probable cause analysis, when Crow arrives at the Fuji restaurant the officers know the following: 1) Crow is identified by Copy and Cooper as a source of supply; 2) Cooper gave a phone number to Agent Larkins which he says contacts Crow; 3) a transaction for ounces of a substance ( law enforcement assumes is methamphetamine)  is negotiated for $200.00 an ounce to be delivered at the Fuji restaurant; 4) Crow arrives at the restaurant; 5) there is no discussion about narcotics, no narcotics are shown, and no money is discussed or changes hands; 6) Crow leaves. Calling this transaction an aborted drug deal assumes facts that were not known but assumed by law enforcement but provided by the mechanism of assumption not belief and now adopted by the court. Defendant objects to the court adopting officers' assumptions as the foundation for probable cause. If probable cause existed, it was weak.

### d. Probable Cause

Reasonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants. See *United States v. Craig*, 198 Fed.Appx. 459, 463 (6th Cir.2006). Probable cause to search a vehicle is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir.1998). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Id. The Fourth Amendment demands that a traffic stop must not be "unreasonable" under the totality of the circumstances. *Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Probable cause is a  commonsense, nontechnical conceptions that deals with " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) In analyzing the reasonableness of the stop, the Court queries "whether the police officer possessed probable cause or reasonable suspicion to believe that a

traffic violation occurred, not whether a traffic violation in fact occurred." United States v. Sanford, 476 F.3d 391, 396 (6th Cir.2007). Here, only reasonable existed.

The aborted drug deal is relied upon by the United States to search the defendant's car. Cooper allegedly introduced Larkins to Crow for the purpose of arranging a drug deal. Cooper had to be relied upon to show that the SUDO phone number (762) 499-5551 was related to Crow. Cooper is unreliable and his information is uncorroborated. Larkins negotiated a deal with someone on the SUDO app but doesn't know who. Crow arrives at the Fuji restaurant parking lot. At the time of the alleged transaction, law enforcement testified that they were buying "zips" which they believed to be methamphetamine because the assumed it to be methamphetamine. There was no exchange of money or showing of narcotics at the scene. Again, if under totality of circumstances there was probable cause it was weak.

 e. **<u>Failed Canine Alert</u>**

Defendant objects to the court's findings that the failed drug dog alert did not dispel probable cause. Using the totality of circumstances analysis, the failed dog sniff is significant. Here, it destroys probable cause to search. The court must consider all relevant facts known to officers. A drug-sniffing dog was brought to the scene here, however, the drug detection dog failed to alert positively to the presence of narcotics in the vehicle. As officer George noted, no independent probable cause existed due to the failed alert by the drug dog. Tr. Pg. 48 Ln. 10-13. The failure to alert dispelled the officers' reasonable suspicion for the stop and the suspicions that Crow was in possession of narcotics. Anik was a certified drug dog highly trained to detect the presence of narcotics, and the dog did not detect any narcotics in the car. Based upon this information, there were no grounds for the police to continue to believe that the vehicle contained narcotics after Anik's failed to alert. This is especially true in light of the testimony of officer Bagwell about drug dealers use of counter-surveillance to discover police officer's undercover. Tr. Pg. 61 ln. 12-Pg. 62 ln. 5.; Tr. Pg. 69 ln. 17-24; Pg 99 ln. 24. See *United States v.*

*Davis*, 430 F.3d 345 (6th Cir. 2005); Failure to alert by a trained narcotics dog dispels suspicion and must be considered in the totality of circumstances. *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005) (Davis held that officers no longer had reasonable suspicion to detain a motorist on suspicion of drug possession after drug-sniffing dog did not alert). This court also held that failure of trained drug dog to alert dispels reasonable suspicion and should be considered in the analysis of probable cause. *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020)

In this case if probable cause existed it was weak because the basis for a search depended upon unreliable informants and uncorroborated information. The transaction was supposed to be about drugs that defendant Crow possessed based upon the SUDO communication. When no drug deal was made, and no drugs were exchanged or seen at Fuji restaurant, and then the certified trained drug dog fails to alert, probable cause is dispelled. The court should overturn the R and R and suppress the search.

## CONCLUSIONS

The defendant would pray the Court grant the motion to suppress and suppress the fruits of the search.

Respectfully submitted,

**FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC.**

By: /s/ Clayton M. Whittaker
**CLAYTON M. WHITTAKER, BPR #013461**
Assistant Federal Defender
*Attorney for Defendant*
835 Georgia Avenue, Suite 600
Chattanooga, Tennessee 37402
(423) 756-4349 fax: (423) 756-4345
Clay.Whittaker@fd.org